1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LORAINE CAMPBELL, individually and as
personal representative of the Estate of
JUSTINE BOOTH,

               Plaintiff,

      v.

STATE OF WASHINGTON, DEPARTMENT
OF SOCIAL AND HEALTH SERVICES,
including but not limited to the Division of
Developmental Disabilities; LASHONDA
MARIE MITCHELL, individually and in her
official capacity acting under color of state law;
MURINE LEE MCGENTY, individually and in
her official capacity acting under color of state
law; SONJA PATE, individually and in her
official capacity acting under color of state law,

               Defendants.

CASE NO. C08-0983-JCC

ORDER

      This matter comes before the Court on Defendant Sonja Pate's Motion for Summary

Judgment (Dkt. No. 59), Plaintiffs' Response (Dkt. No. 74), and Defendant's Reply (Dkt. No.

81); as well as Defendants Lashonda Marie Mitchell and Murine Lee McGenty's Motion for

Partial Summary Judgment (Dkt. No. 60), Plaintiffs' Response (Dkt. No. 74), and Defendants'

ORDER
PAGE - 1

1    Reply (Dkt. No. 72).[1] The Court has carefully considered these papers, their supporting

2    declarations and exhibits, and the balance of relevant materials in the case file, and has

3    determined that oral argument is not necessary. For the reasons explained below, the Court

4    hereby GRANTS Defendants' motions and rules as follows.

5    **I.    BACKGROUND**

6        The facts of this case are undeniably tragic. Plaintiff Lorraine Campbell's

7    developmentally disabled daughter, Justine Booth, died soon after she was found partially

8    drowned in a bathtub while she was under in-home care of state employees through

9    Washington's State Operated Living Alternatives program ("SOLA"). Plaintiff brought suit

10   under 42 U.S.C. § 1983 against officials of the State of Washington Department of Social and

11   Health Services ("DSHS"), which operated the SOLA program, claiming that the officials

12   responsible for Justine's care violated her due process rights under the Fourteenth Amendment

13   by failing to provide Justine with reasonably safe conditions while she was in state custody.

14   (Pl.'s Resp. 2 (Dkt. No. 74).) Plaintiff also claims that the State deprived her of her own due

15   process rights by denying her the companionship of her child. (First Am. Compl. 10─11 (Dkt.

16   No. 24).)

17       At the time of her death, Justine was a 33-year-old woman diagnosed with a severe

18   seizure disorder and significant cognitive disability, who received residential supported living

19   services from individuals trained and employed by DSHS through the SOLA program. (First

20   Am. Compl. ¶ 18 (Dkt. No. 24).) Defendants Mitchell and McGenty were attendant care

21   professionals, employed by SOLA, who were responsible for Justine's care on the night in

22

23   _____

24       [1] Plaintiff's attempt to submit Supplemental Authority (Dkt. No. 95) was neither timely
     nor relevant for purposes of deciding these Motions. Accordingly, Defendants Motion to Stike
     Plaintiff's Notice of Supplemental Authority is GRANTED.

25       Because the Court is granting summary judgment on all outstanding claims,
     Defendant's Motion for Leave to File Excess Pages (Dkt. No. 83) and Plaintiff's Motion to
26   Exclude [Expert Witness] Testimony (Dkt. No. 116) are DENIED as moot.

1  question.  (*See* Def. Mitchell & McGenty Mot. 3 (Dkt. No. 60).) As the Attendant Counselor

2  Manager ("AC Manager") for the SOLA program, Defendant Pate oversaw the provision of

3  services, supervising and ensuring the competency of employees, including Mitchell and

4  McGenty. (Pate Decl. ¶ 3 (Dkt. No. 59-3).) Pate also developed and monitored the Individual

5  Support Plans ("ISPs") for Justine and other clients.

6      The SOLA program provides assisted living services to clients in private homes that

7  they themselves lease. (*Id.*) Justine leased a home in Kent with two other SOLA clients. (Def.

8  Mitchell & McGenty Mot. 3–4 (Dkt. No. 60).) Justine and Campbell selected the SOLA

9  program in 1990, (*see* 4/17/90 DSHS Letter (Dkt. No. 75 at 18)), in part because Campbell

10  wanted Justine to live a "somewhat independent, normal life," and "do as much as she could."

11  (Campbell Dep. 157:24–158:12 (Dkt. No. 85 at 12–13)). While living in the SOLA home in

12  Kent, Justine had round-the-clock care, but she also frequently rode a van to visit Campbell on

13  her own. (*Id.* at 156:12–18.)

14      Upon enrolling Justine in SOLA in 1990, Plaintiff received a letter from DSHS,

15  thanking Justine for "deciding to participate in our program." (4/17/90 DSHS Letter (Dkt. No.

16  75 at 18).)The letter clearly informed Justine and Campbell that "your participation in the

17  DDD Region 4 – State Operated Living Alternatives (SOLA) is voluntary, and that you may

18  withdraw your request for services at any time by contacting your Field Services Office (FSO)

19  Case Manager." (*Id.*)

20      According to Defendant Mitchell's witness statement, shortly after 8:00 p.m. on the

21  night of Justine's death, McGenty told Justine to take her bath and began running bath water

22  for her, filling the tub to approximately five or six inches. (Mitchell Witness Statement 7–8,

23  12, 36 (Dkt. No. 62 at 9–10, 14, 38).) Mitchell reported that they were able to hear Justine

24  while she was in the tub, but there was no baby monitor in the bathroom. (SOLA Investigation

25  Report 35 (Dkt. No. 75 at 129).) Justine got in the bath at around 8:05 or 8:06 p.m. (Mitchell

26  Witness Statement 36 (Dkt. No. 62).) The caregivers then attended to the other residents (for

ORDER
PAGE - 3

1    example, giving one of the other residents a piece of pie) and watched TV in the living room,

2    periodically entering the room where Justine was bathing and reporting to each other on the

3    status of Justine's washing. (*See id.* at 8–13, 38 (Dkt. No. 62 at 10–15, 40).) McGenty

4    discovered Justine unconscious and not breathing at approximately 8:20 p.m. (*Id.* at 37 (Dkt.

5    No. 62 at 39).) During these twenty minutes, the attending caregivers had checked on Justine

6    three times.  (*See id.* at 8–12, 36–37.)

7        Justine never regained consciousness and died one week after the incident. (First Am.

8    Compl. ¶ 49–51 (Dkt. No. 24).)

9    **II.    DISCUSSION**

10       Defendants Pate, Mitchell, and McGenty have moved for summary judgment on a

11   collective total of seven theories. Two of these, however, are ultimately dispositive. All

12   Defendants have argued that Plaintiff's complaint does not state a viable constitutional cause

13   of action, because Justine was voluntarily receiving care services from the State. (Def. Mitchell

14   & McGenty's Mot. 10–12 (Dkt. No. 60); Def. Pate's Mot. 2 (Dkt. No. 59) (adopting Mitchell

15   & McGenty's arguments). ) In the alternative, all Defendants have argued that they are entitled

16   to qualified immunity because the conduct in question did not violate a clearly established

17   constitutional right. (*Id.*) Because the Court finds that: (1) Justine's participation in the SOLA

18   program was voluntary, and, as a consequence, the State of Washington did not owe her a duty

19   to provide reasonably safe conditions, and (2) even assuming that Justine had such a right, it

20   was not clearly established, it is unnecessary to consider Defendants' other arguments.

21   Accordingly, the Court GRANTS summary judgment to Defendants on all federal

22   constitutional claims.

23       **A.  Summary Judgment Standard**

24       Summary judgment is appropriate if, after viewing the evidence in the light most

25   favorable to the nonmoving party, the Court determines there are no genuine issues of material

26   fact. FED. R. CIV. P. 56(c). There is no genuine issue of fact for a trial where the record, taken

1   as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita*

2   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court must inquire into

3   "whether the evidence presents a sufficient disagreement to require submission to a jury or

4   whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty*

5   *Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The moving party bears the initial burden of

6   showing that there is no evidence which supports an element essential to the nonmovant's

7   claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this

8   burden, the nonmoving party then must show that there is in fact a genuine issue for trial.

9   *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine

10  issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*,

11  477 U.S. at 323–24.

12  **B. Justine's Due Process Claims: Reasonably Safe Conditions**

13       In order to state a claim under 42 U.SC. § 1983, a plaintiff must show that: (1) the

14  defendant acted under color of state law; and (2) the defendant's conduct deprived the plaintiff

15  of rights, privileges, or immunities secured by the Constitution or the laws of the United States.

16  *West v. Atkins*, 487 U.S. 42, 48 (1988) (*citing Parratt v. Taylor*, 451 U.S. 527, 535 (1981)

17  (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330–31 (1981).)

18       In this case, it is undisputed that Defendants were acting under color of state law while

19  engaged in administering the SOLA program. (*See* Pl.'s Resp. 13 (Dkt. No. 74).) The issue

20  before the Court, therefore, is whether Defendants deprived Justine of any legally cognizable

21  right secured by the Fourteenth Amendment's Due Process Clause.

22       The Due Process Clause forbids the States from depriving a person of "life, liberty or

23  property without due process of the law . . ." U.S. CONST. amend. XIV, cl. 1.  In general, mere

24  lack of due care by a state official does not deprive an individual of her due process rights,

25  *Daniels*, 474 U.S. at 330–31, because the clause "confer[s] no affirmative right to

26  governmental aid." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196

ORDER
PAGE - 5

1   (1989). The Due Process Clause is "a limitation on the State's power to act, not as a guarantee

2   of certain minimal levels of safety and security." *Id.* at 195–96. That is, the government

3   generally has no affirmative duty to provide safe conditions, even if nonfeasance results in

4   grave injury. In *DeShaney,* for example, the Supreme Court held that county officials did not

5   violate a young boy's due process rights when, despite repeated warnings, they failed to take

6   action to protect a boy from beatings by his father. *Id.* at 191.

7          However, the Supreme Court has articulated a limited exception to this principle when

8   the government takes a person into custody and holds him there against his will, either through

9   incarceration or through involuntary civil commitment. *Id.* at 200. This "special relationship"

10  gives rise to affirmative duties on the part of the Government to provide reasonably safe

11  conditions and other fundamentals of care. For example, in *Estelle v. Gamble*, 429 U.S. 97, 103

12  (1976), the Court found that the government had an obligation under the Eighth Amendment to

13  provide medical care for incarcerated persons. *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982),

14  extended *Estelle*, holding that an involuntarily committed individual had a constitutionally

15  protected interest in reasonably safe conditions and freedom from unreasonable restraint. The

16  Supreme Court in *DeShaney* articulated its reasoning for the exceptions it had provided in

17  *Estelle* and *Youngberg*:

18          The rationale for this principle is simple enough: when the State by an
            affirmative exercise of its power so restrains an individual's liberty that it
19          renders him unable to care for himself, and at the same time fails to provide for
            his basic human needs—e.g. food, shelter, medical care, and reasonable
20          safety—it transgresses the substantive limits on state action set by the Eighth
            Amendment and the Due Process Clause. The affirmative duty to protect arises
21          not from the State's knowledge of the individual's predicament or from its
            expression of intent to help him, but from the limitation which it has imposed
22          on his freedom.

23  *DeShaney*, 489 U.S. at 200 (citations omitted). In other words, *unless* the State has taken

24  affirmative steps to restrain an individual so that she is unable to protect or care for herself, the

25  State has no affirmative constitutional duty of care.

26

ORDER
PAGE - 6

1      In interpreting this precedent, decisions from the First, Second, Third, Fifth, and Eighth

2      Circuit Court of Appeals have held that a developmentally disabled, or mentally ill, individual

3      who is free to leave state custody has no *Youngberg* due process rights.[2] *Monahan v.*

4      *Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 991 (1st Cir. 1992) ("Here, where no such

5      involuntary commitment has occurred, [Plaintiff's] "special relationship" argument is without

6      force."); *Brooks v. Giuliani*, (84 F.3d 1454, 1466 (2d Cir. 1996) ("[I]t is the State's affirmative

7      act of restraining the individual's freedom to act on his own behalf—through incarceration,

8      institutionalization, or other similar restraint of personal liberty—which is the "deprivation of

9      liberty" triggering . . . the Due Process Clause . . . Plaintiffs here are under no state-imposed

10     restraint."); *Torisky v. Schweiker*, 446 F.3d 438 (3d Cir. 2006) ("We hold that the District

11     Court erred in concluding that the state owes an affirmative due process duty of care to

12     residents of a state institution who are free to leave state custody); *Walton v. Alexander*, 44

13     F.3d 1297, 1305 (5th Cir. 1995) ("[i]n short, this 'special relationship' does not arise solely

14     because the state exercises custodial control over an individual when a person *voluntarily*

15     *resides* in a state facility under its custodial rules") (emphasis in original); *Kennedy v. Shaffer*,

16     71 F.3d 292, 295 (8th Cir. 1995) (summary judgment was inappropriate where material fact

17     remained as to whether mental health patient on suicide watch may have effectively become an

18     involuntary patient).

19        Most courts have looked beyond the official label of "voluntary" versus "involuntary"

20     in a patient's relationship with the State to determine whether the plaintiff's liberty was truly

21     restrained, thus giving rise to an affirmative obligation of care. In *Kennedy*, for example, a case

22     in which a mentally ill minor committed suicide while under state custody, the court noted that

23     Missouri law allowed the State to refuse the release of a voluntary mental patient upon a

24     determination that the patient is a risk to herself or others. *Kennedy*, 71 F.3d at 295. Because

25

26        [2] The Court can find no Ninth Circuit decisions on this issue.

ORDER
PAGE - 7

1   the State *could have* restricted the patient's liberty, the question of fact as to the voluntariness

2   of her commitment precluded summary judgment. *Id.*[3] Likewise, in *Monahan*, the First Circuit

3   looked beyond the patient's "voluntary" status for a relationship whereby the plaintiff was a

4   "*de facto* ward of the state," such that the "sufficient combination of helplessness on the part of

5   the deceased, and wanton callousness on the part of those caring for her," would give rise to

6   due process obligations toward a voluntary mental patient. *Monahan*, 961 F.2d at 992.

7   Because the plaintiff's mental condition alone was the limiting factor on his freedom, and not

8   any affirmative action on the part of the State, the court found that the plaintiff had not stated a

9   constitutional claim.  And in *Brooks*, even though the patients' commitment to out-of-state

10  treatment facilities did not give rise to *Youngberg* rights, an "involuntary transfer" to in-state

11  facilities would "restrict plaintiffs' liberty" and thereby "implicate the Due Process Clause." 84

12  F.3d at 1467.

13      In *Torisky*, the case relied on most heavily by Plaintiff, the plaintiffs were guardians of

14  twenty mentally handicapped adults who were voluntary patients of state-run institution. *Id.* at

15  441.  The State had tried to transfer these handicapped adults to private facilities against the

16  will of their guardians. *Id.* During the protested transfer, state police raised a physical blockade

17  to separate the patients from their parents, guardians, and other family. The *Torisky* court noted

18  that the Supreme Court in *Youngberg* had emphasized the need to focus on the facts and

19  circumstances of each case, and accordingly allowed that some voluntarily committed persons

20  may find themselves in "*de facto* involuntary status" if they were no longer allowed to leave

21  state custody. *Torisky*, 446 F.3d at 446–48.  The court found that the combination of "physical

22  and psychological force" used by state employees during the course of the transfer indicated

23

24  ───────────────

25      [3] In so holding, the Eighth Circuit declined to pass on the issue of whether a voluntary
    mental patient enjoys the same due process protections as an involuntary patient, as it was
26  unnecessary, at that time, to consider this "difficult constitutional question."  *Kennedy*, 71 F.3d
    at 295.

ORDER
PAGE - 8

1  that "plaintiffs may be able to prove facts . . . that would establish a deprivation of liberty and a

2  violation of *Youngberg*'s duty of care and protection." *Id.* at 448.

3        On balance, these cases suggest that, depending on the facts and circumstances of the

4  case, a voluntarily committed patient can become a *de facto* involuntary patient if her freedom

5  was—or, in some circuits, could have been—curtailed by the power of the State.[4]  The Court

6  finds these cases to be, on the whole, well-reasoned. *DeShaney*, in no uncertain terms, limited

7  the due process obligation to provide affirmative care to cases where the State "takes a person

8  into its custody and holds him there against his will." *DeShaney*, 489 U.S. at 199–200. The key

9  to the due process obligation to provide care, therefore, is the State's affirmative steps in

10  restraining the individual's liberty, in spite of her desires to the contrary. The State only

11  acquires an affirmative constitutional obligation to provide a safe environment to a

12  developmentally disabled individual when the State prevents that individual from leaving its

13  custody.

14        In this case, Plaintiff seems to acknowledge that her daughter's initial participation in

15  SOLA was officially voluntary, but asserts that her custody become *de facto* involuntary based

16

17  _____

18        [4] It is, in fact, a generous reading of *DeShaney* to assume that the mere *power* to
    restrain is equivalent to the *exercise* of that power.  *See Kennedy*, 71 F.3d at 295. The Court

19  declines, however, to pass on this constitutional question, because the facts of this case do not
    require the Court to consider it. *Cf. Fed'n of Labor v. McAdory,* 325 U.S. 450, 461 (1945).

20        Justine was neither barred from leaving, nor is there any evidence to suggest that she
    could have been so barred under Washington law. Involuntary detention in a residential

21  treatment facility is generally prohibited in this state.  WASH. REV. CODE 11.92.190.  If a
    person who has been voluntarily admitted presents "an imminent likelihood of serious harm, or

22  is gravely disabled," then the staff of the residential treatment facility may detain that person
    for a limited time for further authorization and evaluation.  WASH. REV. CODE 71.05.050.

23  Unlike in *Kennedy*, where the deceased was on Precautionary Suicide Watch and, under a
    similar Missouri statute, the State could have prevented her from leaving, the parties have not

24  argued here that Justine was in "imminent likelihood of serious harm" as a result of her
    condition, nor have they argued that her developmental disabilities meant that she rose to the

25  level of "gravely disabled." Plaintiff has presented no evidence, and indeed has not argued, that
    the state could have involuntarily committed her under Washington law.

26

ORDER
PAGE - 9

1   on the attendant facts and circumstances. (Pl.'s Resp. 5–6, 16–17 (Dkt. No. 74).) Plaintiff's

2   evidence in support of this proposition is sparse. Even overlooking the evidentiary issues raised

3   by Defendants, for purposes of argument, the Court finds that Plaintiff's constitutional claims

4   cannot withstand summary judgment.

5        In a summary judgment motion, the moving party bears the initial burden of showing

6   that there is no evidence to support the nonmovant's claims. *Celotex*, 477 U.S. at 322. Justine

7   entered the SOLA program voluntarily; she chose SOLA with her mother in 1990, and her

8   welcome letter from DSHS declared her voluntary status in no uncertain terms. (4/17/90 DSHS

9   Letter (Dkt. No. 75 at 18).) Defendant Pate notes, correctly, that there is no evidence that

10  would demonstrate a change in the legal relationship between Justine and the State after the

11  date of her voluntary enrollment. (Pate Reply 3 (Dkt. No. 81).) Although the Court will look

12  beyond the label of "voluntary" versus "involuntary" to determine whether the State had taken

13  an affirmative act to keep Justine in its care against her will, the official terms of her SOLA

14  care are persuasive. Pate also points out that SOLA is a Medicare waivered services program,

15  meaning that service recipients like Justine are required by law to be given free choice of

16  providers, and may choose to disenroll from the waiver. 42 U.S.C. § 1396; *see also* Wash.

17  Admin. Code § 388-845-0060(1)(e). Finally, Defendants Mitchell and McGenty assert, and

18  Plaintiff agreed, that a cornerstone of SOLA is its focus on independence and normal living.

19  (*See* Def. Mitchell & McGenty Mot. 11 (Dkt. No. 60); Campbell Dep. 157–58 (Dkt. No. 85 at

20  13).) On balance, Defendants have met their initial burden; they have demonstrated that the

21  State had not taken any affirmative steps, nor could it take those steps, to restrict Justine's

22  freedom to choose whether to remain in the SOLA program.

23        Once the movant has met her burden, the nonmoving party must show that there is a

24  genuine issue of material fact in order to prevent summary judgment. *Anderson*, 477 U.S. at

25  250. In the present case, Plaintiff has not raised evidence sufficient to show there is a genuine

26  issue of material fact for trial. Plaintiff repeats that Justine was under "state custody and

ORDER
PAGE - 10

1  control," (*see, e.g.*, Pl.'s Resp. 16 (Dkt. No. 74)), but this assertion misses the point—the

2  question is not whether Justine was under state care, but whether she was *involuntarily* in that

3  care, such that the State either did, or could have, prevented her from exiting the SOLA

4  program, despite her wishes to the contrary.

5      Looking at Plaintiff's assertions in the light most favorable to her case, the facts she

6  alleges created a *de facto* involuntary commitment are as follows. First, Plaintiff alleges that

7  SOLA placed locks on the door of Justine's SOLA home so that she could not run away. (Pl.'s

8  Resp. 16–17 (Dkt. No. 74).) Plaintiff also alleges that SOLA maintained exclusive control over

9  Justine's bathing, transportation, diet, and wardrobe. (*Id.* at 17). Second, Justine was

10  cognitively limited, and, in fact, legally incompetent under Washington Revised Code Section

11  11.88 because Justine was "incapable of managing either her property or herself and is in need

12  of a full guardian over her person and estate." (*Id.*; *see also* Order Appointing Guardian (Dkt.

13  No. 75 at 12–13).) Third, Plaintiff alleges—unsupported by evidence—that Justine was not

14  authorized to move herself out of her SOLA home, or decline services, of her own free will.

15  (Pl.'s Resp. 17 (Dkt. No. 74).) Finally, Plaintiff points to the fact that she was stripped of her

16  guardianship rights over Justine in 1995. (*See* Order on Citation for Contempt of Court (Dkt.

17  No. 75 at 20).) Plaintiff, therefore, alleges that she could not remove Justine from SOLA. (Pl.'s

18  Resp. 17 (Dkt. No. 74).) The divestment of her guardianship rights also meant that Plaintiff

19  was not consulted when SOLA moved Justine to Kent, and, indeed, that Justine was moved

20  against Plaintiff's objections; it also meant that Plaintiff was not present at Justine's 2006 ISP

21  meeting, despite a request to postpone that meeting so that she could attend. (*Id.*)

22      Even assuming that Plaintiff can prove this body of evidence at trial, there is no

23  genuine issue of material fact here. Justine was not a *de facto* involuntary patient.

24      First, Plaintiff points primarily to facts that simply ensured Justine's day-to-day safety

25  and care. The facts that Justine relied heavily on SOLA caretakers, and that they put locks on

26  her doors at night, reflect precautions and protocols that were part of her participation in the

1   program—precautions that were tailored to Justine's particular needs. Justine had a propensity

2   to "elope," and was found headed to the freeway on more than one occasion. (*See* Admission

3   Medical Evaluation (Dkt. No. 61 at 4).) Under these circumstances, it may have been negligent

4   for her caretakers *not* to have attempted to curtail Justine's potentially dangerous wanderings.

5   Indeed, Justine appears to have had as much freedom as her medical conditions would safely

6   allow; for example, when her seizure disorder permitted it, she was free to leave the SOLA

7   home, alone, to visit her mother and participate in community activites. (*See, e.g.*, Witness

8   Statement 5–6 (Dkt. No. 62 at 7–8) (describing the open atmosphere of the SOLA home and

9   Justine's participation in Elder Care activities); Campbell Dep. 156:12–24 (Dkt. No. 85 at 11)

10  (describing Justine visiting Plaintiff at her house by taking an Access van).) Most importantly,

11  safety measures, such as locks on her doors at night, do not speak to the legal conclusion that is

12  necessary to find a custodial relationship between Justine and the State—Justine's freedom to

13  exit the SOLA program altogether (not just exit her room) if she, or her guardian, so chose. To

14  hold otherwise would be to open the door to arguments that, for example, elementary school

15  students are in involuntary state "custody" because they are provided with free lunch and

16  prevented from exiting school grounds. The Court therefore holds, as a matter of law, that

17  safety, care, and maintenance precautions alone do not indicate *de facto* involuntary status.

18  *See, e.g.*, *Walton*, 44 F.3d at 1299 (stating that *Youngberg*'s protections do not arise solely

19  because the State exercises custodial control over an individual when a person voluntarily

20  resides in a state facility under its custodial rules).

21       Plaintiff's second argument that Justine's mental and legal incapacity rendered her

22  custody involuntary also fails as a matter of law. The Court agrees with the other courts that

23  considered the issue: Incapacity alone does not create *de facto* involuntary commitment,

24  because this too only speaks to the individual's condition, not the State's power. Only the latter

25  is an appropriate locus for a due process inquiry. As in *Monahan*, it appears that it was

26  Justine's own mental disability that restricted her freedom to leave SOLA care, not the State.

1    *Monahan*, 961 F. 2d at 992. Justine's legal status as an incompetent also does not address the

2    State's actions to restrain her liberty. Legally incompetent individuals are not automatically

3    involuntary wards of the State. *See* WASH. REV. CODE 11.92.190 (preventing the State from

4    detaining any individual against her will, without involuntary commitment procedures).

5             Third, Plaintiff makes bare assertions that Justine was not free to leave state custody.

6    Plaintiff alleges in her declaration that, as a result of her incapacity, Justine was unable to

7    terminate her participation in the SOLA program, (Campbell Decl. ¶ 22 (Dkt. No. 79 at 4)), but

8    does not provide any documentation to support that contention. Former SOLA employee

9    Bonny Oborn agrees that "because of her legal incapacity, Justine did not have the authority to

10   terminate her participation in SOLA," (Oborn Decl. ¶ 21 (Dkt. No. 78 at 4)), but again this

11   conclusion is unsupported by documentation or authority indicating that the State could have

12   prevented Justine from leaving. Finally, Plaintiff's expert Joan Ramon makes the bare assertion

13   that "it is apparent that Justine's cognitive impairment prevented her from controlling her own

14   participation in the SOLA program." (Ramon Decl. ¶ 25 (Dkt. No. 76).) First, these statements

15   are naked, unsupported assertions of a legal conclusion that the Court could appropriately

16   disregard on a motion for summary judgment. *See Villiarimo v. Aloha Island Air*, 281 F.3d

17   1054, 1061 (9th Cir. 2009); *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). These

18   allegations therefore do not provide the evidentiary support necessary to withstand summary

19   judgment under *Celotex*. More importantly, each of these statements rests its conclusion on an

20   argument already rejected by the Court. Each one states that Justine was not free to exit SOLA

21   custody *by reason of her incompetence*. As already discussed, Justine's mental impairment is

22   insufficient, as a matter of law, to make her an involuntary ward of the State of Washington,

23   because it speaks only to Justine's own condition, not to the State's power. *See Monahan*, 961

24   F. 2d at 992. Nothing in any of these declarations indicates that SOLA employees could

25   *prevent* Justine from leaving the program, if she—or someone authorized to make decisions on

26   her behalf—choose to do so.

ORDER
PAGE - 13

1     Finally, the most perplexing issue in this constellation of facts has to do with Plaintiff's

2     status as Justine's guardian. Plaintiff asserts that her guardianship over Justine's "person and

3     estate" was terminated by court order in 1995. (Campbell Decl. ¶ 14, 15, 16 (Dkt. No. 79 at

4     3).[5] She states that, after her guardianship lapsed, her treatment by SOLA officials changed;

5     she states that she was not permitted to delay the 2006 meeting as to her ISP to permit her

6     attendance, and that Justine was moved out of Seattle, and to Kent county, over her objections.

7     (*See id*; *see also* Campbell Decl. ¶ 15 (Dkt. No. 79 at 3).)[6]

8     However, even if Plaintiff were divested of the guardianship over Justine's person, the

9     fact that *Plaintiff* was no longer Justine's legal guardian does not necessarily mean that *no one*

10    could remove her from SOLA—that the State, by virtue of Plaintiff's lapsed guardianship,

11    somehow became vested with the authority to prevent Justine from leaving SOLA care. Again,

12    the focus in this due process inquiry is not on Justine, or on her guardian—it is on the power of

13    the State to hold Justine against her will. *See Deshaney*, 489 U.S. at 195 (the Due Process

14    _____

15    
16         [5] The Court is skeptical that termination of guardianship of estate somehow left Justine,
      a legally incompetent individual, without a guardian over her person. Plaintiff was appointed
17    guardian of Justine's "person and estate" as of November 13, 1991. (Order Appointing
      Guardian 2 (Dkt. No. 75 at 13).) In 1995, Plaintiff was apparently held in contempt of court for
18    failing to "properly complete the estate"; the applicable court order indicates that "guardian as
      to the *estate* is terminated." (Order on Citation for Contempt of Court ¶ 3, 6A (Dkt. No. 75 at
19    20) (emphasis added).) Guardianship as to estate, and guardianship as to person, are distinct in
      Washington. The latter requires the guardian to marshal the ward's assets and make certain
20    filings, WASH. REV. CODE 11.92.040, which Plaintiff apparently failed to do (Campbell Dep.
      65 (Dkt. No. 85 at 5)), while the former requires the guardian to "care for and maintain the
21    incompetent." WASH. REV. CODE 11.92.043.  However, all parties assumed that Plaintiff's
      guardianship had lapsed in its entirety. (Campbell Dep. 65–66 (Dkt. No. 85 at 5-6).) Neither
22    party has briefed the Court on what effect the termination of Plaintiff's guardianship over
      Justine's estate would have over Justine's legal status—i.e. who, precisely, *was* Justine's legal
23    guardian after Plaintiff's guardianship lapsed (if it did)—so that issue is not properly before the
      Court. As explained, however, the resolution of this puzzle is not material for the disposition of
24    this case.
25         [6] Plaintiff's evidence indicates that she was, in fact, present at nearly every one of
      Justine's annual ISP meetings from 1995, when her guardianship lapsed, to 2006, when Justine
26    died. (*See* Def. Repl. 6 (Dkt. No. 84).)

ORDER
PAGE - 14

1   Clause duties only arise out of the "limitation which [the State] has imposed on [the patient's]

2   freedom to act on his own behalf"). It would be illogical—not to mention bad precedent—to

3   hold that a family member can convert a voluntary placement into an involuntary one by

4   letting paperwork lapse. As discussed, the State must make some affirmative act in restraining

5   a person against her wishes in order to incur positive obligations of care under the Due Process

6   Clause. In sum, these facts speak to Justine's legal relationship with her mother, not with the

7   State, and are insufficient as a matter of law to establish that Justine's home care through

8   SOLA was *de facto* involuntary commitment.

9        Taken as a whole, Plaintiff's evidence is simply insufficient to demonstrate that the

10  State itself, rather than Justine's own disabilities and Plaintiff's failure to complete the

11  guardianship paperwork, prevented her from leaving SOLA care. Ultimately, Plaintiff has not

12  provided sufficient evidence that would allow a rational trier of fact to conclude that the State

13  took the affirmative steps necessary to eliminate Justine's freedom and choice. Because Justine

14  received SOLA care voluntarily, under *DeShaney* and its progeny, Justine had no due process

15  liberty interest in safe conditions that the government was obliged to protect.  Plaintiff's § 1983

16  claim for violations of her constitutional rights must therefore fail as a matter of law.[7]

17  **C. Campbell's Due Process Claims: Companionship**

18       The Ninth Circuit has recognized a parent's liberty interest in the companionship and

19  society of his or her child, and that state interference with that interest without due process

20  creates a cause of action under 42 U.S.C. § 1983. *Lee v. City of Los Angeles*, 250 F.3d 688, 685

21  (9th Cir. 2001); *see also Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 2001) (allowing

22  parents of an adult child who had been shot and killed by police to proceed with their § 1983

23

24  _____

25       [7] Because the Court finds that Justine was voluntarily under state care, the Court does
    not reach the question of whether Defendants acted with the "deliberate indifference," not mere

26  negligence, required to state a cause of action under § 1983.

ORDER
PAGE - 15

1    action alleging deprivation of companionship and society with their child). The Ninth Circuit

2    has also declined to require a showing of specific intent to deprive parents of companionship or

3    interfere with the parent-child relationship. *Rentz v. Spokane County*, 438 F. Supp. 2d 1252,

4    1265 (E.D. Wash. 2006) (*citing Ward v. City of San Jose*, 967 F.2d 280, 283 (9th Cir. 1998)).

5           Plaintiff is therefore correct to assert that she has an interest in the companionship and

6    society of her daughter that is protected by the Due Process Clause. However, her interest only

7    arises where the underlying state action against her daughter rises to the level of a

8    constitutional violation. *See, e.g.*, *Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1060 (9th

9    Cir. 2004) (denying parents' § 1983 claim because state action against their son was not a

10   constitutional violation); *Corales v. Bennett*, 488 F. Supp. 2d 975 (C.D. Cal. 2007) ("To be

11   actionable under this theory, claims [for violation of the liberty interest in companionship]

12   must be based on underlying wrongful governmental conduct that amounts to a constitutional

13   deprivation.") As discussed above, there was no due process violation of her daughter's rights.

14   Plaintiff's personal claims must therefore also fail as a matter of law.

### D. Qualified Immunity

16          Even if Plaintiff or Justine had constitutionally protected interests, Defendants are

17   entitled to qualified immunity. Qualified immunity protects a state official from personal

18   liability where her conduct does not violate clearly established state or constitutional rights.

19   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Where a court determines that the right at

20   issue was not clearly established at the time of the alleged violation, qualified immunity

21   protects the government official. *See Callahan v. Pearson*, 129 S.Ct. 808, 818 (2009) (no

22   longer requiring courts first to determine whether Plaintiff has shown a general constitutional

23   violation before determining whether that right is clearly established) (overruling *Saucier v.*

24   *Katz*, 533 U.S. 194 (2001)). The relevant inquiry in determining whether a right is clearly

25   established is whether it would be clear to a reasonable official that her conduct was unlawful

26   in the situation she confronted.  *Friedman v. Boucher*, 568 F.3d 1119, 1130 (9th Cir. 2009).

ORDER
PAGE - 16

1    Plaintiff bears the burden of showing that the rights she claims were clearly established

2    at the time of the violation. *Moran v. State of Wash.*, 147 F.3d 839 (9th Cir. 1998) (*citing Davis*

3    *v. Scherer,* 468 U.S. 183, 197 (1984)). In the present case, Plaintiff has not met that burden.

4    As discussed above, the duty owed to a developmentally disabled person who has been

5    voluntary placed in state care is still in flux. To the extent that *Youngberg* put Defendants on

6    notice of the duty to provide reasonably safe conditions for developmentally disabled persons,

7    nearly *every case* interpreting *Youngberg*—and every one that the Court is aware of at the

8    circuit level—has limited that case's scope to involuntarily committed individuals. As

9    discussed above, SOLA was a voluntary program. Defendants were not reasonably on notice

10   that failing to remain in the bathroom with Justine while she bathed was a constitutional

11   violation. Even if Defendants had interfered with a protected right, this right was not a clearly

12   established one. Defendants are therefore entitled to qualified immunity.

13   **III.    CONCLUSION**

14   For the foregoing reasons, Defendant Pate's Motion for Summary Judgment (Dkt. No.

15   59), and Defendants Mitchell and McGenty's Motion for Partial Summary Judgment (Dkt. No.

16   60), are hereby GRANTED.

17   Defendant's Motion for Leave to File Excess Pages (Dkt. No. 83) and Plaintiff's

18   Motion to Exclude [Expert Witness] Testimony (Dkt. No. 116) are DENIED as moot. As

19   explained above, Plaintiff's Notice of Supplemental Authority (Dkt. No. 95) is DENIED;

20   Defendant's Motion to Strike this authority is GRANTED.

21   DATED this 14th day of September, 2009.

22

23

24   John C. Coughenour

25   John C. Coughenour
     UNITED STATES DISTRICT JUDGE

26

ORDER
PAGE - 17